## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASHRAF MOSTAFA, derivatively on behalf of ZETA GLOBAL HOLDINGS CORP., | Case No.: 1:24-cv-09450 |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| DAVID A. STEINBERG, CHRISTOPHER GREINER, JOHN SCULLEY, IMRAN KHAN, WILLIAM ROYAN, JENÉ ELZIE, WILLIAM LANDMAN, ROBERT NIEHAUS, and JEANINE SILBERBLATT, | |
| Defendants, | |
| and | |
| ZETA GLOBAL HOLDINGS CORP., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Ashraf Mostafa ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Zeta Global Holdings Corp. ("Zeta" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants David A. Steinberg ("Steinberg"), Christopher Greiner ("Greiner"),  John Sculley ("Sculley"), Imran Khan ("Khan"), William Royan ("Royan"), Jené Elzie ("Elzie"), William Landman ("Landman"), Robert Niehaus ("Niehaus"), and Jeanine Silberblatt ("Silberblatt") (collectively, the "Individual Defendants," and

together with Zeta, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zeta, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Steinberg and Greiner for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zeta, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 27, 2024 through November 13, 2024, both dates inclusive (the "Relevant Period").

2.      Founded in 2007 by Defendants Steinberg and Sculley, Zeta offers an omnichannel data-driven cloud platform, powered by artificial intelligence, that provides businesses with consumer intelligence and marketing automation software.

3.      The Company's platform, called the Zeta Marketing Platform, or ZMP, is purportedly the "largest omnichannel marketing platform with identity data at its core" and "can

analyze billions of structured and unstructured data points to predict consumer intent by leveraging sophisticated machine learning algorithms and the industry's largest opted-in data set for omnichannel marketing."

4.     As such, ZMT boasts "one of the largest proprietary data sets in the U.S." composed of "an amalgamation of [] private proprietary data, publicly available data and data provided by [a] partner ecosystem." As of December 31, 2023, ZMT "contain[ed] more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference."

5.     The Relevant Period began on February 27, 2024 when the Company announced its financial results for the full year and fourth quarter of the fiscal year ending December 31, 2023 ("2023 Fiscal Year") via press release. The press release represented, among other things, positive growth for the Company and that its revenue "***primarily arises from use of our technology platform via subscription fees, volume-based utilization fees and fees for professional services***."[1] Other subsequent filings with the SEC represented that Zeta collects individuals' data "***directly from the consumers when they register or interact with our platform (such as the DISQUS commenting system), or with partners' services***."

6.     However, unbeknownst to the public during the Relevant Period, these statements regarding Zeta's revenue growth and the method of collection of individuals' data by the Company proved to be false, as the reality was that the Individual Defendants caused Zeta to use two-way contracts to artificially inflate financial results and engage in round-trip transactions to artificially inflate financial results. Despite this, during the Relevant Period, the Individual Defendants

---

[1] Unless otherwise noted, all emphasis is added.

concealed this reality, instead highlighting the effectiveness of the Company's methods and procedures, as well as Zeta's organic growth and data collection methods.

7.      The truth emerged on November 13, 2024 at approximately 1 p.m. EST when market research group Culper Research released a report titled "Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam" (the "Culper Report"), which revealed that the "integrity of the Company's data collection and reported financials" is severely undermined because (1) "Zeta has formed 'two-way' contracts with third party consent farms wherein the Company simultaneously acts as both a supplier and a buyer of consumer data" allowing Zeta to "flatter reported revenue growth" and indicating possible "round-tripping" of revenue and (2) Zeta collects most of its customer data from a network of "sham websites that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses" (together, the "Data Collection Misconduct"). As such, the Individual Defendants breached their fiduciary duties to the Company by engaging in the Data Collection Misconduct.

8.      During the Relevant Period, the Individual Defendants also breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Data Collection Misconduct; (2) as such, the Data Collection Misconduct almost completely spurred the Company's growth; (3) as a result of this, the Company's financial results were artificially inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable

4

basis at all relevant times.

9.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

10.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.      In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.      In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's, the CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Zeta. Plaintiff has continuously owned Company common stock since before the beginning of the Relevant Period.

### Nominal Defendant Zeta

18.     Zeta is a Delaware corporation with its principal executive offices at 3 Park Avenue, 33rd Floor, New York, New York 10016. Zeta's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ZETA."

### Defendant Steinberg

19.     Defendant Steinberg has served as a Company director since founding the Company in 2007. He is also the Company's CEO and controlling shareholder. According to the proxy statement that the Company filed with the SEC on April 26, 2024 (the "2024 Proxy Statement"), as of April 29, 2024, Defendant Steinberg beneficially owned 3,330,895 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Steinberg owned approximately $42 million worth of Zeta Class A stock as of that date. He also owned 29,055,489 shares of the Company's Class B common stock as of April 29, 2024. When combined with his aforementioned ownership of Class A stock, Defendant Steinberg's holds 61.2% of the total voting power of the Company, making him the Company's controlling shareholder.

20.     The 2024 Proxy Statement stated the following about Defendant Steinberg:

David Steinberg has been a member of our Board since 2007 and is the Co-founder, Chairman and Chief Executive Officer of Zeta. Mr. Steinberg is also Chairman of CAIVIS Investment Company, Kica Investments and On Demand Pharmaceuticals. Previously, he was the founder and Chief Executive Officer of InPhonic, a seller of wireless phones and communications products and services. Prior to that he was the Chairman and Chief Executive Officer of Sterling Cellular. He holds a BA in Economics from Washington & Jefferson College.

**<u>Defendant Greiner</u>**

21.     Defendant Greiner has served as the Company's CFO since 2020. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Greiner beneficially owned 1,626,344 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Greiner owned approximately $20.5 million worth of Zeta Class A stock as of that date.

22.     The 2024 Proxy Statement stated the following about Defendant Greiner:

Christopher Greiner has been the Chief Financial Officer of Zeta since 2020. He has over 20 years of experience in the technology industry. Prior to joining Zeta,

Mr. Greiner served as Chief Financial Officer of LivePerson Inc., an AI-powered conversational cloud provider, from 2018 through March 2020 and before that spent five years at Inovalon, a cloud-based healthcare and life sciences analytics company, first as Chief Product and Operations Officer and then as Chief Financial Officer. Mr. Greiner also held roles of increasing executive responsibility at IBM from 1999 until 2012 and Computer Sciences Corporation ("CSC") from 2012 to 2013. He holds a BBA in Finance and Economics from Baylor University.

**Defendant Sculley**

23.    Defendant Sculley is a co-founder of Zeta and has served as a Company director since 2008. He is also the Vice Chairman of Zeta and currently serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Sculley beneficially owned 2,153,237 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Sculley owned approximately $27.2 million worth of Zeta Class A stock as of that date.

24.    The 2024 Proxy Statement stated the following about Defendant Sculley:

John Sculley has served on our Board since 2008 and is the Co-founder and Vice Chairman of Zeta. Since leaving his role of CEO at Apple Computer, Inc. in 1993, Mr. Sculley has focused on investing in early-stage companies as a venture capitalist and co-founder of several companies. He holds a BA from Brown University and an MBA from the Wharton School at the University of Pennsylvania.

**Defendant Khan**

25.    Defendant Khan has served as a Company director since June 18, 2024. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Khan beneficially owned 15,000 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Khan owned approximately $189,600 worth of Zeta Class A stock as of that date.

26.     The 2024 Proxy Statement stated the following about Defendant Khan:

Imran Khan is the founder and has served as Chief Investment Officer of Proem Asset Management, an investment firm that focuses on the technology space, since 2019. Additionally, Imran co-founded and is currently chairman of Verishop, an eCommerce enablement company that empowers independent and emerging brands. In addition to Verishop, Imran is also a member of the board of directors at Dave Inc. Prior to co-founding Proem Asset Management, Imran served as Snap Inc.'s Chief Strategy Officer, where he oversaw the company's corporate strategy, revenue generation, business operations and partnerships. Previously, Imran was a Managing Director and Head of Global Internet Investment Banking at Credit Suisse. Before joining Credit Suisse, Imran held the role of Managing Director and Head of Global Internet Research at JPMorgan Chase. Imran holds a Bachelor of Science in Business Administration (B.S.B.A.) in Finance and Economics from the University of Denver.

**Defendant Royan**

27.     Defendant Royan has served as a Company director since 2017. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Royan beneficially owned 16,289,746 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Royan owned approximately $206 million worth of Zeta Class A stock as of that date.

28.     The 2024 Proxy Statement stated the following about Defendant Royan:

William Royan has served on our Board since 2017. He is the Managing Partner and Chair of the Investment Committee of GPI Capital, an alternative investment firm. Previously, he was a member of the Global Management Committee and Chief Investment Officer of a predecessor fund of BTG Pactual, a global financial services firm. Mr. Royan has been a director of numerous public and private companies, including the TMX Group, a Canadian financial services company that operates various market exchanges, where he chaired its Governance Committee, and BTG Pactual, a financial company offering investment banking, as well as wealth and asset management services. He holds a Bachelor of Commerce from the University of Calgary and an MBA from the University of Chicago.

**Defendant Elzie**

29.     Defendant Elzie has served as a Company director since 2021. She also serves as

a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Elzie beneficially owned 52,692 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Elzie owned approximately $666,027 worth of Zeta Class A stock as of that date.

30.    The 2024 Proxy Statement stated the following about Defendant Elzie:

Jené Elzie has served on our Board since 2021. She has over three decades of experience as a sports and entertainment executive, having worked for and with some of the most respected global brands in the industry, including NBA, Golf Channel, Comcast/NBCUniversal, and Fox Sports. She has served as Managing Director, Investment Team at Dunes Point Capital, a private equity firm, since 2023 and as President of Seven Springs Global Advisors, a business transformation advisory firm, since 2022. From 2018 to 2022, Ms. Elzie served as Chief Growth Officer for Athletes First Partners, a sports marketing agency representing sports properties, including the National Basketball Players Association, the National Basketball Retired Players Association, and the US Olympic & Paralympic Committee. She also serves on the board of Varsity Brands, Inc. and Invited (ClubCorp.) From 2013 to 2018, she served as Vice President, International Marketing at the National Basketball Association. Ms. Elzie holds a bachelor's degree in economics and a master's degree in sociology, both from Stanford University.

**Defendant Landman**

31.    Defendant Landman has served as a Company director since 2008. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nomainting and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Landman beneficially owned 1,078,931 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Landman owned approximately $13.7 million worth of Zeta Class A stock as of that date.

32.    The 2024 Proxy Statement stated the following about Defendant Landman:

William Landman has served on our Board since 2008. Mr. Landman is the Co-founder and Managing Principal of MainLine Investment Partners, LLC, where he directs the investment activities, management and strategic initiatives of the company and its affiliates, MainLine Private Wealth and Merion Realty Partners. Since 1987, Mr. Landman has also been a Principal and Senior Managing Director of CMS Companies, an alternative investments firm. Further, he is a Senior Advisor at Renovus Capital, an education-oriented small business investment company, and is a Principal and Manager of Merion Residential, a real estate management company. He holds a BA from the University of Pittsburgh and a JD from the University of Pittsburgh School of Law.

**Defendant Niehaus**

33.    Defendant Niehaus has served as a Company director since 2012. He also serves as the Chair of the Audit Committee and the Compensation Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Niehaus beneficially owned 52,692 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Niehaus owned approximately $666,027 worth of Zeta Class A stock as of that date.

34.    The 2024 Proxy Statement stated the following about Defendant Niehaus:

Robert Niehaus has served on our Board since 2012 and has over 30 years of experience in investment and private equity. Mr. Niehaus is the Chairman and Founder of GCP Capital Partners LLC ("GCP") and has served as Chairman of GCP and its predecessor business Greenhill Capital Partners and their respective Investment Committees since 2000. In addition, Mr. Niehaus is Chairman of Iridium Communications Inc., a satellite communications company, and previously served as a Director for Heartland Payment Systems, a payments technology business. He holds a BA in international affairs from Princeton University and an MBA from Harvard Business School.

**Defendant Silberblatt**

35.    Defendant Silberblatt has served as a Company director since 2022. She also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Silberblatt beneficially owned 52,692

shares of the Company's Class A common stock. Given that the price per share of the Company's

Class A common stock at the close of trading on April 29, 2024 was $12.64, Defendant Silberblatt

owned approximately $666,027 worth of Zeta Class A stock as of that date.

36.    The 2024 Proxy Statement stated the following about Defendant Silberblatt:

> Jeanine Silberblatt has served on our Board since 2022. She has over 20 years of
> experience across retail, tech and finance, having worked for or with large
> omnichannel retailers, direct-to-consumer brands, AI-enabled business models and
> financial services firms. She most recently served as Vice President, eCommerce
> & Digital Marketing, at Pottery Barn Teen at Williams-Sonoma, Inc. from 2020 to
> 2023. From 2017 to 2020, she was the Vice President/General Manager,
> Merchandising & Brand Partnerships at Stockwell AI Inc. She is also a Founding
> Member of Chief, a private network designed for senior women leaders to
> strengthen their leadership journey, cross-pollinate ideas across industries, and
> effect change from the top-down. She also serves on the board of Fashion Incubator
> San Francisco (FiSF), a non-profit incubator committed to turning fashion apparel
> designers into successful San Francisco entrepreneurs and employers. Ms.
> Silberblatt holds a Bachelor of Science from Delaware State University and an
> MBA from Harvard Business School.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.    By reason of their positions as officers, directors, and/or fiduciaries of Zeta and

because of their ability to control the business and corporate affairs of Zeta, the Individual

Defendants owed Zeta and its shareholders fiduciary obligations of trust, loyalty, good faith, and

due care, and were and are required to use their utmost ability to control and manage Zeta in a fair,

just, honest, and equitable manner. The Individual Defendants were and are required to act in

furtherance of the best interests of Zeta and its shareholders so as to benefit all shareholders

equally.

38.    Each director and officer of the Company owes to Zeta and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in

the use and preservation of its property and assets and the highest obligations of fair dealing.

39.    The Individual Defendants, because of their positions of control and authority as

directors and/or officers of Zeta, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.    To discharge their duties, the officers and directors of Zeta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zeta, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Zeta's Board at all relevant times.

42.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause

the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

43.     To discharge their duties, the officers and directors of Zeta were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zeta were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Zeta's own Code of Ethics and Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zeta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zeta and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zeta's operations would comply with all applicable

laws and Zeta's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.    Each of the Individual Defendants further owed to Zeta and the shareholders the duty of loyalty requiring that each favor Zeta's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Zeta and were at all times acting within the course and scope of such agency.

46.    Because of their advisory, executive, managerial, directorial, and controlling positions with Zeta, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

47.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zeta.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

48.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Zeta was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zeta, and was at all times acting within the course and scope of such agency.

## ZETA'S CODE OF CONDUCT

### *Code of Conduct*

53.     Zeta's Code of Conduct states that "All directors, officers and employees (each a "Covered Party" and, collectively, the "Covered Parties") of the Company and all of its subsidiaries and controlled affiliates are expected to be familiar with the Code and to adhere to those principles and procedures set forth below.  Covered Parties must conduct themselves accordingly, exhibiting the highest standard of business and professional integrity, and seek to avoid even the appearance of improper behavior."

54.     The Code of Conduct was adopted to encourage the following:

• Honest and ethical conduct, including fair dealing and the ethical handling of

actual or apparent conflicts of interest;

• Full, fair, accurate, timely and understandable disclosure;

• Compliance with applicable governmental laws, rules and regulations;

• Prompt internal reporting of any violations of law or the Code;

 • Accountability for adherence to the Code, including fair process by which to determine violations;

• Consistent enforcement of the Code, including clear and objective standards for

compliance;

• Protection for persons reporting any such questionable behavior;

 • The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

• Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

55.    Under the heading "Disclosures," the Code of Conduct states the following, in

relevant part:

The information in the Company's public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties.  Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

56.    In the section titled "Compliance with Laws, Rules and Regulations," the Code of

Conduct states:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

The Chief Executive Officer, Chief Financial Officer, SVP, Finance, and SVP, Global Controller  (or persons performing similar functions) of the Company (together, the "Senior Financial Officers") are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

Covered Parties located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act ("FCPA") and U.S. export control laws, in addition to applicable local laws.

57.     Under the heading "Reporting, Accountability and Enforcement," the Code of

Conduct states the following, in relevant part:

> The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including the officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation. Covered Parties can also anonymously report ethical concerns or wrongdoing, by using the following link: Anonymous Reporting.
>
> Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof.  Reports may be made anonymously.    If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.
>
> The Audit Committee of the Board or other appropriate officer or body shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports.  The Audit Committee or other appropriate officer or body will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.
>
> To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith.  Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

58.     In the section, "Waivers," the Code of Conduct states:

> Before an employee, or an immediate family member of any such employee, engages in any activity that would be otherwise prohibited by the Code, he or she is strongly encouraged to obtain a written waiver from the Board or other appropriate officer or body.
>
> Before a director or executive officer, or an immediate family member of a director or executive officer, engages in any activity that would be otherwise prohibited by the Code in provisions I through IX above, he or she must obtain a written waiver from the disinterested directors of the Board.  Such waiver must then be disclosed to the Company's shareholders, along with the reasons for granting the waiver.

19

59.    In the section, "Accuracy of Business Records," the Code of Conduct states:

All financial books, records and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles (GAAP) and to the Company's system of internal controls. No entry may be made that intentionally hides or disguises the true nature of any transaction. Covered Parties should therefore attempt to be as clear, concise, truthful and accurate as possible when recording any information.

Waivers or exceptions to the Code for any employee will be granted only in advance and under exceptional circumstances by the Legal department. A waiver of the Code for any executive officer or member of our board of directors may be made only by the board of directors or a designated committee of the board.

### *Corporate Governance Guidelines*

60.    Zeta also maintains a set of Corporate Governance Guidelines for the Board to follow. The Corporate Governance Guidelines were adopted to "assist the Board in the exercise of its responsibilities and to serve the interests of the Company and its stockholders."

61.    The Corporate Governance Guidelines state that "Director Responsibilities" include the following:

Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include:

• exercising their business judgment in good faith;

• acting in what they reasonably believe to be the best interest of all stockholders;

• becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

• ensuring that the business of the Company is conducted so as to further the long term interests of its stockholders.

62.    In violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public

and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ZETA'S AUDIT COMMITTEE CHARTER

63.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to:

> The purpose of the Audit Committee (the "Committee") is to assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor.
>
> The Committee's responsibilities are limited to oversight.  The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

64.     Within the subheading "Interaction with the Independent Auditor," under the heading "Duties and Responsibilities," the Audit Committee Charter states:

> Appointment and Oversight.  The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to

the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

Annual Report on Independence and Quality Control. The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

65.    Within the subheading "Annual Financial Statements and Annual Audit," under the heading "Duties and Responsibilities," the Audit Committee Charter states that:

Audit Problems. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

Form 10-K Review. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

Audit Committee Report. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

66.    In the same section, under the subheading titled "Quarterly Financial Statements," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

67.    In the same section, under the subheading titled "Other Duties and Responsibilities," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

Review of Earnings Releases. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

Risk Assessment and Risk Management. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

Hiring of Independent Auditor Employees. The Committee must set clear hiring policies for employees or former employees of the Company's independent auditor.

Complaint Procedures. The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

Reports to the Board of Directors. The Committee must report regularly to the Board regarding the activities of the Committee.

Committee Self-Evaluation. The Committee must at least annually perform an evaluation of the performance of the Committee.

Review of this Charter. The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

68.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

69.    Founded in 2007 by Defendants Steinberg and Sculley, Zeta offers an omnichannel data-driven cloud platform, powered by artificial intelligence, that provides businesses with consumer intelligence and marketing automation software.

70.    The Company's platform, called the Zeta Marketing Platform, or ZMP, is purportedly the "largest omnichannel marketing platform with identity data at its core" and "can analyze billions of structured and unstructured data points to predict consumer intent by leveraging sophisticated machine learning algorithms and the industry's largest opted-in data set for omnichannel marketing."

71.    As such, ZMT boasts "one of the largest proprietary data sets in the U.S." composed of "an amalgamation of [] private proprietary data, publicly available data and data provided by [a] partner ecosystem." As of December 31, 2023, ZMT "contain[ed] more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference."

**False and Misleading Statements**

***February 27, 2024 Press Release***

72.    On February 27, 2024, the Company issued a press release that reported Zeta's 2023 Fiscal Year and fourth quarter of the 2023 Fiscal Year financial results. The press release heralded the Company's "Fourth Consecutive Year of 20%+ Revenue Growth in 2023." In particular, the press release stated the following, in relevant part:

**Zeta Delivers Fourth Consecutive Year of 20%+ Revenue Growth in 2023**

*Finished 2023 with 10 straight quarters of beating & raising guidance*

*• Delivered revenue of $210M, up 20% Y/Y in 4Q'23, and $729M, up 23% Y/Y in 2023*

 *• Increased Scaled Customer count 12% Y/Y and Super-Scaled Customer count 27% Y/Y*

 *• Grew Scaled Customer ARPU 10% Y/Y to $1.57M in 2023*

*• Generated cash flow from operating activities of $27M in 4Q'23, and $91M in 2023*

*• Guiding to fifth consecutive year of 20%+ revenue growth*

\* \* \*

**Full Year 2023 Highlights**

 • Total revenue of $729 million, increased 23% Y/Y.

• Scaled Customer ARPU of $1.57 million, increased of 10% Y/Y.

• Super Scaled Customer ARPU of $4.55 million, increased of 1% Y/Y.

• Direct platform revenue mix of 72% of total revenue, compared to 77% in 2022.

• Net Revenue Retention of 111%, compared to 112% in 2022.

 • GAAP cost of revenue percentage of 37.7%, increased 120 basis points Y/Y

• GAAP net loss of $187 million, or 26% of revenue, was driven primarily by $243 million of stock-based compensation. The net loss in 2022 was $279 million, or 47% of revenue.

 • GAAP loss per share of $1.20, compared to a loss per share of $2.01 in 2022.

• Cash flow from operating activities of $91 million, compared to $78 million in 2022.

 • Free Cash Flow1 of $55 million, compared to $39 million in 2022.

• Repurchased $15.4 million worth of shares through our share repurchase program.

• Adjusted EBITDA1 of $129.4 million, an increase of 40% compared to $92.2 million in 2022.

• Adjusted EBITDA margin1 of 17.8%, compared to 15.6% in 2022.

***February 28, 2024 Form 10-K***

73.    On February 28, 2024, the Company filed its annual report on Form 10-K ("2023 10-K") with the SEC. The  2023 10-K was signed by Defendants Steinberg, Greiner, Ravella, Elzie, Landman, Niehaus, Royan, Sculley, and Silberblatt and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Steinberg and Greiner attesting to the accuracy of the 2023 10-K and representing that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

74.    The 2023 10-K discussed Zeta's purported revenue recognition policies and procedures, the purported value of its contract assets, and the purported value of its vendor agreements. In particular, the 2023 10-K stated, in relevant part, the following:

***Revenues***

***Our revenue primarily arises from use of our technology platform via subscription fees, volume-based utilization fees and fees for professional services***. Our platform revenue comprised of a mix of direct platform revenue and integrated platform revenue, which leverages API integrations with third parties. ***For 2023 and 2022, we derived 72% and 77% of our revenues from direct platform revenue, respectively, and 28% and 23% of our revenues from integrated platform revenue, respectively. Revenues are recognized when control of these services is transferred to our customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those services***. Sales and other taxes collected by us are excluded from revenue. Our revenue recognition policies are discussed in more detail under "Critical Accounting Estimates."

* * *

***Revenue recognition***

26

*Revenue arises primarily from our technology platform via subscription fees, volume-based utilization fees and fees for professional services* designed to increase our customers' usage of our technology platform. Sales and other taxes collected by us concurrent with revenue-producing activities are excluded from revenues.

* * *

*We have certain revenue contracts with our vendors that involve both the purchase and sale of services with a single counterparty. We perform an assessment of the services transferred to determine the independent nature of both the transactions and accordingly revenue and expense are based on the fair value of the services provided or received.*

75.     The 2023 10-K also discussed Zeta's sales, product, and data collection policies, boasting that Zeta has "the industry's largest opted-in data set for omnichannel marketing," allegedly composed of "more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally." In particular, the 2023 10-K stated the following, in relevant part:

Our Zeta Marketing Platform, or ZMP, is the largest omnichannel marketing platform with identity data at its core. The ZMP can analyze billions of structured and unstructured data points to predict consumer intent by leveraging sophisticated machine learning algorithms and the industry's ***largest opted-in data set*** for omnichannel marketing. The ZMP acts on these insights by connecting with consumers through native integration of marketing channels and API integration with third parties. The ZMP's data-driven algorithms and processes learn and optimize each customer's marketing program in real time, producing a 'flywheel effect' that enables our customers to test, learn and improve their marketing programs in real time.

* * *

*We have also dedicated significant resources to the goal of building customer trust by developing and implementing programs designed to protect data privacy and to promote a secure technical environment.* The resources we dedicated to this goal include engineers, analysts, lawyers, policy experts and operations specialists, as well as hardware and software from leading vendors and solutions we have designed and built. In particular, we have implemented a number of technical innovations, process enhancements and industry solutions in response to our increased obligations with respect to our data. *For example, we can identify and implement user consent parameters and opt-in or opt-out as applicable and can evaluate whether such consents apply to our various data sources, products*

27

***or customers.***

The ZMP is built on the following four pillars:

**1.  *Opted-in Data Set***

Our data set is an amalgamation of our private proprietary data, publicly available data and data provided by our partner ecosystem.

***Our data set contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally*** with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference. On average, we ingest more than one trillion content consumption signals per month on a global basis and synthesize this information into hundreds of intent-based audiences, which can then be used to create marketing programs. All this data is managed through a proprietary database structure that has patented flexibility, speed and scalability.

*  *  *

***The principal way that we collect individual opted-in data is directly from the consumers when they register or interact with our platform (such as the DISQUS commenting system), or with partners' services***. We also use various tracking technologies, both proprietary and those provided through third-party suppliers in order to connect to individuals across marketing channels for the purpose of targeting consumers and delivering campaigns.

***April 26, 2024 Proxy Statement***

76.    On April 26, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

77.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Steinberg and Sculley to the Board; (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named

executive officers.

78.    Regarding "Board Leadership Structure and Role in Risk Oversight," the 2024

Proxy Statement stated the following, in relevant part:

> Our Amended and Restated Bylaws and Corporate Governance Guidelines provide our Board with flexibility to combine or separate the positions of Chairperson of the Board and Chief Executive Officer in accordance with its determination that utilizing one or the other structure would be in the best interests of our Company. The Company's current Board leadership structure comprises a combined Chairperson of the Board and Chief Executive Officer as well as highly qualified, active independent directors. Our Board exercises its judgment in combining or separating the roles of Chairperson of the Board and Chief Executive Officer as it deems appropriate in light of prevailing circumstances. The Board will continue to exercise its judgment on an ongoing basis to determine the optimal Board leadership structure that the Board believes will provide effective leadership, oversight and direction, while optimizing the functioning of both the Board and management and facilitating effective communication between the two. The Board has concluded that the current structure provides a well-functioning and effective balance between strong Company leadership and appropriate safeguards and oversight by independent directors.

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.

79.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following,

in relevant part:

> We have a written Code of Ethics and Conduct that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, and agents and representatives. We have posted a current copy of the Code of and Ethics and Conduct on our website, www.investors.zetaglobal.com, in the "Governance" section under "Governance Documents." The nominating and corporate governance committee of our Board is responsible for overseeing our code of ethics and conduct and any waivers applicable to any director, executive

officer or employee. We intend to disclose any future amendments to certain provisions of our code of ethics and conduct, or waivers of such provisions applicable to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, and agents and representatives, on our website identified above or in public filings within four business days. In addition, we intend to post on our website all disclosures that are required by law or the rules of the NYSE concerning any amendments to, or waivers from, any provision of the Code of Ethics and Conduct.

80.    Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt, caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company was engaged in the Data Collection Misconduct; (2) as such, the Data Collection Misconduct almost completely spurred the Company's growth; (3) as a result of this, the Company's financial results were artificially inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

81.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

82.    As a result of Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Steinberg and Sculley to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the

selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

### *May 6, 2024 Press Release*

83.    On May 6, 2024, Zeta issued a press release announcing its financial results for the first quarter of the 2024 Fiscal Year. The press release heralded Zeta's "Accelerating Growth" including "revenue of $195M, an increase of 24% Y/Y." In particular, the press release stated the following, in relevant part:

**Zeta Beats 1Q'24 and Guides to Accelerating Growth in 2024**

 • Delivered revenue of $195M, an increase of 24% Y/Y

• Grew total Scaled Customer count to 460, an increase of 8 Q/Q, and Super Scaled Customer count to 144, an increase of 13 Q/Q

• Expanded quarterly Scaled Customer ARPU 11% Y/Y to $416K

• Generated cash flow from operating activities of $25M, an increase of 23% Y/Y, and Free Cash Flow of $15M, an increase of 51% Y/Y

• Raising guidance for each quarter of 2024 with the full year revenue growth rate expected to accelerate

* * *

**First Quarter 2024 Highlights**

• Total revenue of $195 million, increased 24% Y/Y.

• Scaled Customer count increased to 460 from 452 in 4Q'23 and 411 in 1Q'23.

• Super-Scaled Customer count increased to 144 from 131 in 4Q'23 and 110 in 1Q'23.

 • Quarterly Scaled Customer ARPU of $416,000, increased 11% Y/Y.

 • Quarterly Super-Scaled Customer ARPU of $1.12 million, decreased 3% Y/Y.

• Direct platform revenue mix of 67% of total revenue, compared to 73% in 4Q'23, and compared to 71% in 1Q'23.

• GAAP cost of revenue percentage of 39.4%, decreased 80 basis points Q/Q, and increased 490 basis points Y/Y.

• GAAP net loss of $40 million, or 20% of revenue, driven primarily by $53 million of stock-based compensation. The net loss in 1Q'23 was $57 million, or 36% of revenue.

• GAAP loss per share of $0.23, compared to a loss per share of $0.38 in 1Q'23.

• Cash flow from operating activities of $25 million, compared to $20 million in 1Q'23.

• Free Cash Flow of $15 million, compared to $10 million in 1Q'23.

• Repurchased $3.5 million worth of shares through our share repurchase program.

• Adjusted EBITDA of $30.5 million, increased 27% Y/Y compared to $24.0 million in 1Q'23.

• Adjusted EBITDA margin of 15.6%, compared to 15.3% in 1Q'23.

***May 7, 2024 Form 10-Q***

84.    On May 7, 2024, the Company filed its quarterly report on Form 10-Q ("Q1 2023 10-Q") with the SEC. The Q1 2023 10-Q was signed by Defendants Steinberg and Greiner and attached SOX certifications were signed by Defendants Steinberg and Greiner attesting to the accuracy of the Q1 2023 10-Q and representing that "the information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

85.    The Q1 2023 10-Q discussed Zeta's purported revenue recognition policies and procedures, the purported value of its contract assets, and the purported value of its vendor agreements. In particular, the Q1 2023 10-Q stated, in relevant part, the following:

**Revenue Recognition**

*Revenue arises primarily from the Company's technology platform via subscription fees, volume-based utilization fees and fees for professional services designed to maximize the customer usage of technology.*

*Revenues are recognized when control of these services is transferred to the customers, in an amount that reflects the consideration we expect to be entitled to an exchange for those services.* Sales and other taxes collected by the Company concurrent with revenue-producing activities are excluded from revenues.

* * *

**Contract assets and liabilities**

Contract assets represent revenue recognized for contracts that have not been invoiced to customers. ***Total contract assets were $7,770 and $5,346 as of March 31, 2024 and December 31, 2023***, respectively, and are included in the account receivables, net, in the condensed unaudited consolidated balance sheets.

Contract liabilities consists of deferred revenue that represent amounts billed to the customers in excess of the revenue recognized. Deferred revenue is subsequently recorded as revenues when earned in accordance with the Company's revenue recognition policies. During the three months ended March 31, 2024 and 2023, the Company billed and collected $3,382 and $3,096 in advance, respectively, and recognized $2,228 and $1,616, respectively, as revenues. As of March 31, 2024 and December 31, 2023, the deferred revenue were $4,455 and $3,301, respectively.

### July 31, 2024 Press Release

86.    On July 31, 2024, Zeta issued a press release announcing its financial results for the second quarter of the 2024 Fiscal Year. The press release heralded Zeta's "Accelerate[d] Revenue Growth" including "record quarterly revenue of $228M, up 33% Y/Y." In particular, the press release stated the following, in relevant part:

**Zeta Accelerates Revenue Growth and**
Achieves the "Rule of 50" in 2Q'24

• Delivered record quarterly revenue of $228M, up 33% Y/Y and $16M better than guidance

• Grew total Scaled Customer count to 468, an increase of 8 Q/Q and 43 Y/Y

• Increased quarterly Scaled Customer ARPU to $479K, up 22% Y/Y, 2x faster than 1Q'24

• Generated cash flow from operating activities of $31M, an increase of 51% Y/Y, and Free Cash Flow of $20M, an increase of 53% Y/Y

• Raising 2024 revenue guidance by $25M to a midpoint of $925M or 27% Y/Y growth

* * *

**Second Quarter 2024 Highlights**

• Total revenue of $228 million, increased 33% Y/Y.

• Scaled Customer count increased to 468 from 460 in 1Q'24 and 425 in 2Q'23.

• Super-Scaled Customer count of 144 compared to 144 in 1Q'24 and 118 in 2Q'23.

• Quarterly Scaled Customer ARPU of $479,000, increased 22% Y/Y.

• Quarterly Super-Scaled Customer ARPU of $1.3 million, increased 18% Y/Y.

• Direct platform revenue mix of 67% of total revenue, compared to 67% in 1Q'24, and 75% in 2Q'23.

• GAAP cost of revenue percentage of 40%, increased 50 basis points Q/Q, and increased 390 basis points Y/Y.

• GAAP net loss of $28 million, or 12% of revenue, driven primarily by $52 million of stock-based compensation. The net loss in 2Q'23 was $52 million, or 30% of revenue.

• GAAP loss per share of $0.16, compared to a loss per share of $0.34 in 2Q'23.

• Cash flow from operating activities of $31 million, compared to $21 million in 2Q'23.

• Free Cash Flow 1 of $20 million, compared to $13 million in 2Q'23.

• Repurchased $2.9 million worth of shares through our share repurchase program.

• Adjusted EBITDA 1 of $38.5 million, increased 44% Y/Y compared to $26.8 million in 2Q'23.

• Adjusted EBITDA margin 1 of 16.9%, compared to 15.6% in 2Q'23.

***August 31, 2024 Form 10-Q***

87.     On August 31, 2024, the Company filed its quarterly report on Form 10-Q ("Q2 2023 10-Q") with the SEC. The Q2 2023 10-Q was signed by Defendants Steinberg and Greiner and attached SOX certifications were signed by Defendants Steinberg and Greiner attesting to the accuracy of the Q2 2023 10-Q and representing that "the information contained in the [Q2 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

88.     The Q2 2023 10-Q discussed Zeta's purported revenue recognition policies and procedures, the purported value of its contract assets, and the purported value of its vendor agreements. In particular, the Q2 2023 10-Q stated, in relevant part, the following:

**Revenue Recognition**

*Revenue arises primarily from the Company's technology platform via subscription fees, volume-based utilization fees and fees for professional services designed to maximize the customer usage of technology*.

*Revenues are recognized when control of these services is transferred to the customers, in an amount that reflects the consideration we expect to be entitled to an exchange for those services*. Sales and other taxes collected by the Company concurrent with revenue-producing activities are excluded from revenues.

*When the Company enters into contracts with third parties in which the Company is acting as both a vendor and a customer, the Company performs an assessment of the services transferred to determine the independent nature of both the transactions. The Company presents the revenue and expense based on the fair value of the services provided or received*.

*Contract assets and liabilities*

Contract assets represent revenue recognized for contracts that have not been invoiced to customers. *Total contract assets were $7,985 and $5,346 as of June 30, 2024 and December 31, 2023, respectively*, and are included in the account receivables, net, in the condensed unaudited consolidated balance sheets.

Contract liabilities consists of deferred revenues that represent amounts billed to the customers in excess of the revenue recognized. Deferred revenues are subsequently recorded as revenues when earned in accordance with the Company's revenue recognition policies. *During the six months ended June 30, 2024 and*

*2023, the Company billed and collected $7,878 and $4,249 in advance, respectively, and recognized $7,496 and $3,096, respectively, as revenues. As of June 30, 2024 and December 31, 2023, the deferred revenues were $3,683 and $3,301, respectively.*

***November 11, 2024 Press Release***

89.    On November 11, 2024, Zeta issued a press release announcing its financial results for the third quarter of the 2024 Fiscal Year. The press release heralded Zeta's "accelerate[d] Revenue Growth to 42%" and "record revenue of $268M, an increase of 42% Y/Y." In particular, the press release stated the following, in relevant part:

**Zeta Accelerates Revenue Growth to 42% and**
Achieves the "Rule of 60" in 3Q'24

• Delivered record revenue of $268M, an increase of 42% Y/Y

• Grew Direct revenue 41% Y/Y and increased Direct revenue mix by 300 bps Q/Q to 70%

• Increased Scaled Customer ARPU to $557K, a record increase of 33% Y/Y

• Generated cash flow from operating activities of $34M, an increase of 51% Y/Y, and Free Cash Flow of $26M, an increase of 93% Y/Y

• Raising 4Q24 revenue growth guidance to 40% Y/Y

\* \* \*

**Third Quarter 2024 Highlights**

• Total revenue of $268.3 million, increased 42% Y/Y, up 31% Y/Y excluding political candidate revenue.

• Scaled Customer count increased to 475 from 468 in 2Q'24 and 440 in 3Q'23.

• Super-Scaled Customer count of 144 compared to 144 in 2Q'24 and 124 in 3Q'23.

• Quarterly Scaled Customer ARPU of $557,231, increased 33% Y/Y.

• Quarterly Super-Scaled Customer ARPU of $1.6 million, increased 30% Y/Y.

• Direct platform revenue grew 41% Y/Y at a mix of 70% of total revenue,

compared to 67% in 2Q'24, and 70% in 3Q'23.
 • GAAP cost of revenue percentage of 39%, decreased 60 basis points Q/Q, and increased 50 basis points Y/Y.

• GAAP net loss of $17.4 million, or 6% of revenue, driven primarily by $47.2 million of stock-based compensation. The net loss in 3Q'23 was $43.1 million, or 23% of revenue.

 • GAAP loss per share of $0.09, compared to a loss per share of $0.27 in 3Q'23.

• Cash flow from operating activities of $34.4 million, compared to $22.8 million in 3Q'23.

• Free Cash Flow 1 of $25.7 million, compared to $13.4 million in 3Q'23.

• Repurchased $3.9 million worth of shares through our share repurchase program.

• Adjusted EBITDA 1 of $53.6 million, increased 59% Y/Y compared to $33.7 million in 3Q'23.

• Adjusted EBITDA margin 1 of 20.0%, compared to 17.9% in 3Q'23.

***November 12, 2024 Form 10-Q***

90.     On November 12, 2024, the Company filed its quarterly report on Form 10-Q ("Q3 2023 10-Q") with the SEC. The Q3 2023 10-Q was signed by Defendants Steinberg and Greiner and attached SOX certifications were signed by Defendants Steinberg and Greiner attesting to the accuracy of the Q3 2023 10-Q and representing that "the information contained in the [Q2 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

91.     The Q3 2023 10-Q discussed Zeta's purported revenue recognition policies and procedures, the purported value of its contract assets, and the purported value of its vendor agreements. The  Q3 2023 10-Q also discussed Zeta's liabilities related to acquisitions, including "projections for businesses acquired in its Apptness, [ ] and ArcaMax acquisitions." In particular, the Q3 2023 10-Q stated, in relevant part, the following:

**Revenue Recognition**

***Revenue arises primarily from the Company's technology platform via subscription fees, volume-based utilization fees and fees for professional services designed to maximize the customer usage of technology.***

***Revenues are recognized when control of these services is transferred to the customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those services.*** Sales and other taxes collected by the Company concurrent with revenue-producing activities are excluded from revenues.

***When the Company enters into contracts with third parties in which the Company is acting as both a vendor and a customer, the Company performs an assessment of the services transferred to determine the independent nature of both the transactions. The Company presents the revenue and expense based on the fair value of the services provided or received.***

*Contract assets and liabilities*

Contract assets represent revenue recognized for contracts that have not been invoiced to customers. ***Total contract assets were $11,998 and $5,346 as of September 30, 2024 and December 31, 2023, respectively***, and are included in the account receivables, net, in the condensed unaudited consolidated balance sheets.

Contract liabilities consists of deferred revenues that represent amounts billed to the customers in excess of the revenue recognized. Deferred revenues are subsequently recorded as revenues when earned in accordance with the Company's revenue recognition policies ***During the nine months ended September 30, 2024 and 2023, the Company billed and collected $19,104 and $4,724, respectively, in advance, and recognized $18,819 and $4,620, respectively, as revenues. As of September 30, 2024 and December 31, 2023, the deferred revenues were $3,586 and $3,301, respectively***.

92.    The statements in paragraphs ¶¶ 72-75 and 83-91 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Data Collection Misconduct; (2) as such, the Data Collection Misconduct almost completely spurred the Company's growth; (3) as a result of this, the Company's financial results were artificially inflated; and (4) the Company failed to maintain

internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

### *November 13, 2024 Culper Research Report*

93.    The truth emerged on November 13, 2024 at approximately 1 p.m. EST when market research group Culper Research released the Culper Report, which revealed that Zeta had engaged in the Data Collection Misconduct. The Culper Report alleged that the "integrity of the Company's data collection and reported financials" is severely undermined because (1) "Zeta has formed 'two-way' contracts with third party consent farms wherein the Company simultaneously acts as both a supplier and a buyer of consumer data" allowing Zeta to "flatter reported revenue growth" and indicating possible "round-tripping" of revenue and (2) Zeta collects most of its customer data from a network of "sham websites that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses." For example, the Culper Report alleged Zeta and its subsidiaries operate several fraudulent job boards which are designed to trick individuals into submitting personal data under the pretense of job applications. The Culper Report also found that Zeta's "most valuable data" comes from these predatory websites, referred to as consent farms, which are "responsible for almost the entirety of the Company's growth." In particular, the Culper Report revealed the following:

### Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam

We are short Zeta Global Holdings Corp ("ZETA", "the Company") for two distinct, but related reasons, each of which we believe undermine the integrity of the Company's data collection and reported financials. ***First, we believe Zeta has formed "two-way" contracts with third party consent farms wherein the Company simultaneously acts as both a supplier and a buyer of consumer data, not only allowing the Company to flatter reported revenue growth, but raising round tripping concerns. Second, we believe that Zeta has quietly spun up its own network of consent farms i.e., sham websites that hoodwink millions of***

***consumers each month into handing their data over to Zeta under false pretenses, baited by job applications, stimulus money, or other rewards that simply do not exist.*** We believe that these consent farms have driven almost the entirety of Zeta's growth over the past 2+ years and now represent 56% of reported Adj. EBITDA.

\* \* \*

***Our report presents substantial evidence to suggest that Zeta holds additional "two-way" contracts with its advertising partners, many of which are other consent farms***. For example, Zeta-run websites disclose that the Company sells customer data to Digital Media Solutions ("DMS"), which went bankrupt in September 2024. We uncovered an October 2024 bankruptcy filing in which DMS names "Zeta: Apptness" as a "major customer", suggesting that ***the two groups are selling data back and forth, i.e., de facto round-tripping.*** Zeta has not disclosed the extent of these "two-way" contracts – after all, the Company has kept quiet about its massive consent farm operation in the first place – but we counted at least 20 consent farming websites that Zeta lists among its partners.

\* \* \*

We uncovered at least 40 websites run by Apptness and Arcamax – with names such as higherincomejobs.com, onlygreatjobs.com, stimmoney.com, and unclaimedmoneyinfo.com – that ***bait visitors into disclosing data to Zeta under the promise of job applications, stimulus checks, or other rewards that don't actually exist***. These are massive operations: SimilarWeb data reveals that these sites have received an astounding 158.7 million visits from 85.9 million unique visitors in the past year alone.

\* \* \*

We believe these consent farms have become critical to Zeta's business. One former employee told us that on a combined basis, Apptness and Arcamax were internally expected to generate $300 million in revenues after 2 years under Zeta's control.

\* \* \*

***[U]sing a reverse website lookup service, we found that Apptness Media owns at least 3 websites, each of which appear to be job board websites***, including higherincomejobs.com and higherincomejobs.net. In December 2023, Apptness filed a Florida fictitious name registration for "Higher Income Jobs", corroborating its ownership:



At first glance, higherincomejobs.com appears to be a run-of-the-mill job board. However, the vast majority of website visitors do not land directly on the higherincomejobs.com home page, as one might expect from someone using the website like they do LinkedIn. Instead, SimilarWeb data shows that 98% of inbound website visitors land on subdomains such as "amazon03.higherincomejobs.com", "fedex05.higherincomejobs.com" or "goodwill01.higherincomejobs.com" as illustrated below:



Once visitors land on one of these pages, they are baited into submitting their personal information, as the sites blatantly rip off logos from would-be employers such as FedEx, despite having no affiliation with the employer.

We visited numerous higherincomejobs.com listings, and rather than being met with genuine job applications, every single link we followed led us instead to "dummy" pages designed to reap our personal information

* * *

We cross-referenced common addresses, phone numbers, and corporate records to find at least 40 websites that appear to be run by Apptness

* * *

[For example] unclaimedmoneyinfo.com [which] dangles the prospect of "unclaimed money" to its visitors, only to collect users' data, much like we saw of the sham job listings offered by higherincomejobs.com.

41



*SimilarWeb data further estimates that in total, over the last twelve months (ended October 2024) these websites collectively received an astounding 158.7 million from 85.9 million unique visitors.*

| # | Website | Date Registered | Last Updated | LTM Visits (Ms) | LTM Unique Visitors (Ms) |
|---|---------|-----------------|--------------|-----------------|--------------------------|
| 1 | higherincomejobs.com | Sep-16 | Sep-24 | 62.2 | 36.2 |
| 2 | onlygreatjobs.com | Dec-17 | Nov-23 | 43.0 | 20.1 |
| 3 | stimmoney.com | Mar-20 | Feb-24 | 14.7 | 7.4 |
| 4 | freshcareerfinder.com | Aug-16 | Jul-24 | 12.7 | 6.1 |
| 5 | unclaimedmoneyinfo.com | Jul-20 | Jun-24 | 9.8 | 5.6 |
| 6 | apptrck.com | Mar-20 | Feb-24 | 8.7 | 5.7 |
| 7 | eligibilitylookup.com | Sep-20 | Aug-24 | 2.0 | 1.3 |
| 8 | arcamaxjobs.com | Apr-22 | Apr-23 | 1.6 | 1.2 |
| 11 | jobzoodle.com | Nov-21 | Oct-24 | 1.2 | 0.8 |
| 9 | topjobofferstoday.com | May-23 | Apr-24 | 0.9 | 0.4 |
| 10 | signupconfirmed.com | Jun-22 | May-24 | 0.8 | 0.6 |
| 14 | bingearcamax.com | Sep-22 | Jul-24 | 0.5 | 0.3 |
| 13 | localcareerz.com | Dec-20 | Nov-23 | 0.3 | 0.2 |
| 12 | mybestjobmatch.com | May-23 | Apr-24 | 0.3 | 0.2 |
| 15 | americanjobfinder.com | Dec-20 | Nov-23 | n/a | n/a |
| 16 | yourmorningtea.com | Feb-21 | Dec-23 | n/a | n/a |
| 17 | americanresourcehub.com | Feb-21 | Jan-24 | n/a | n/a |
| 18 | welcomeconfirmation.com | Jun-22 | May-24 | n/a | n/a |
| 19 | **betterincomesearch.com** | Sep-22 | Aug-24 | n/a | n/a |
| 20 | **hijnow.com** | Feb-23 | Jan-24 | n/a | n/a |
| 21 | **getmorehigherincomejobs.com** | Feb-23 | Jan-24 | n/a | n/a |
| 22 | **higherincomeplans.com** | Mar-23 | Feb-24 | n/a | n/a |
| 23 | **higherincomejobsworld.com** | Mar-23 | Feb-24 | n/a | n/a |
| 24 | **finesthigherincomejobsonline.com** | Mar-23 | Feb-24 | n/a | n/a |
| 25 | **preferablehigherincomejobs.com** | Mar-23 | Feb-24 | n/a | n/a |
| 26 | **getworkfromhomejobs.com** | May-23 | Apr-24 | n/a | n/a |
| 27 | searchjobsdirect.com | May-23 | Apr-24 | n/a | n/a |
| 28 | topdollarcareers.com | May-23 | Apr-24 | n/a | n/a |
| 29 | **higherjobupdates.com** | Jul-23 | Jun-24 | n/a | n/a |
| 30 | **moreincomejobs.com** | Jul-23 | Jul-24 | n/a | n/a |
| 31 | **earnhigherincomes.com** | Jul-23 | Jul-24 | n/a | n/a |
| 32 | gohigherincomejobsprime.com | Oct-23 | Nov-24 | n/a | n/a |
| 33 | higherincomejobscareers.com | Oct-23 | Nov-24 | n/a | n/a |
| 34 | gethigherincomejobonline.com | Mar-24 | Mar-24 | n/a | n/a |
| 35 | highincomecareeroptions.com | Apr-24 | Apr-24 | n/a | n/a |
| 36 | eliteearningopportunities.com | Apr-24 | Apr-24 | n/a | n/a |
| 37 | tophigherincomejobsforu.com | May-24 | May-24 | n/a | n/a |
| 38 | higherincomejobsupdate.com | May-24 | May-24 | n/a | n/a |
| 39 | **higherincomejobsresult.com** | May-24 | May-24 | n/a | n/a |
| 40 | registerednursingcareers.com | Jun-24 | Jun-24 | n/a | n/a |
| | **TOTAL** | | | **158.7** | **85.9** |

*bolded domains auto-redirect to higherincomejobs.com or other ZETA websites*

*n/a listed are redirects and/or insignificant web traffic less than 100,000 visits in the LTM*

* * *

*We Estimate Zeta's Consent Farms Have Driven Almost the Entirety of Revenue Growth Since Being Acquired, Now Represent 56% of EBITDA.*

We believe that Zeta's consent farming network, spearheaded by Apptness and Arcamax and bolstered by share gains in the wake of the FTC's charges against Fluent, have driven almost the entirety of Zeta's revenue growth since being acquired, and now represent 56% of LTM Adjusted EBITDA. A summary of our estimates are shown in the table, with our full commentary below.

| Culper Est. ZETA Consent Farm Business | $ millions |
|---|---|
| Est. Revenues: Apptness | $230 |
| Est. Revenues: Arcamax | $110 |
| Est. Revenues: Fluent share gain | $63 |
| **Est. Total: Consent Farm Revenues** | **$403** |
| Est. EBITDA Margin Contribution | 23% |
| **Est. Consent Farm EBITDA** | **$94** |
| Reported Revenues, LTM ended Q3 2024 | $901 |
| Reported Revenues, LTM ended Q4 2021 | $458 |
| Revenue Growth: Q4 2021 to Q3 2024 | $443 |
| Reported Adj. EBITDA, LTM ended Q3 2024 | $167 |
| **Consent Farms as % of Revenue Growth** | **91%** |
| **Consent Farms as % of Adj. EBITDA** | **56%** |

* * *

**Zeta's "Two-Way" Relationships with Third Party Consent Farms Raise Revenue Round-Tripping Concerns, In Our View**

We are not only concerned by the problematic ways in which Zeta appears to collect customer data and its significant impact on the business, but by the Company's "two-way" relationships with third-party consent farms, which we believe raises revenue round-tripping concerns. **Kubient: Sources Suggest Zeta is Customer-1 in DOJ Round-Tripping Fraud Complaint**

In September 2024, former Kubient (OTC:KBNT) CEO Paul Roberts pled guilty to accounting fraud charges in connection with Kubient's scheme to "improperly recognize more than $1.3 million in fraudulent revenue" representing "over 94% of Kubient's reported revenue" ahead of its 2020 IPO. According to the complaint, in October 2019, Kubient formed an agreement with an unnamed "Company-1" to round-trip revenues between the two companies, without either company ever actually providing services to the other.

* * *

Zeta disclosed in its Q2 2023 Form 10-Q that:

44

*"We and members of our senior executive team have received subpoenas from the Securities and Exchange Commission in connection with an investigation into Kubient, Inc., a company we worked with prior to our initial public offering, and from the United States Attorney's Office for the Southern District of New York, which is conducting a parallel investigation. The amount of business that we conducted with Kubient was quantitively insignificant to Zeta and we have not worked with Kubient since 2020. We are cooperating with the investigation."*

Based on this disclosure as well as conversations with those familiar, ***we find it highly probable that Zeta is the unnamed "Company-1" mutual beneficiary referenced in the DOJ complaint***. We also note that the now-charged Roberts and Steven Gerber, Current President and COO at Zeta, previously worked together at Tranzact Media, which was also co-founded by Zeta's former President Michael Dimaio.

\* \* \*

**Zeta's Own Disclosures Confirm: The Company Has Two-Way Deals With Many Other Consent Farms, Many of Which Have Incestuous Relationships with Zeta**

Zeta holds itself out to investors as servicing large enterprises, yet our review of the Company's customers – as disclosed by the Company itself – reveals that Zeta also sells leads to third party consent farms, many of whom also appear to serve as suppliers to Zeta. See for example that Higher Income Jobs discloses its list of third party advertising partners, while this same list can be found on other Apptness-run websites. As shown, many of Zeta's "third party advertising partners" are themselves consent farms[.]

\* \* \*

**In 2023, Zeta's Auditor Identified a Critical Audit Matter Related to Revenue Recognition on these Two-Way Contracts. Further Language Suggests They are Numerous**

In Zeta's 2023 Form 10-K, the Company disclosed for the first time a critical audit matter related to revenue recognition "on contracts with third parties in which the Company is acting as both a vendor and a customer.

\* \* \*

Zeta's auditor E&Y then states that the group addressed the critical audit matter by "selecting a sample of contracts for detailed testing wherein the Company is acting as both a vendor and customer..." and "making inquiries of management regarding the nature of the arrangement" among other checks. Setting this aside, ***the very fact***

*that Zeta has enough contracts of this nature such that auditors can only evaluate a sample of these contracts corroborates our view that contracts of this nature are widespread.*

In total, we found at least 20 other consent farming websites that Zeta lists as among its "third party advertising partners."

* * *

**Zeta CEO Previously Ran InPhonic, Which Was Charged by the FTC for Misleading Customers, and Formers Were Later Charged with "Round-Tripping" Transactions to Inflate Financials**

We find Zeta's predatory consent farms and two-way contracts particularly interesting in light of two sets of fraud charges levied against Zeta CEO David Steinberg's prior company, InPhonic Inc.

Zeta's long-time CEO and, per his Instagram, full-time socialite David Steinberg co-founded InPhonic Inc alongside Zeta Chairman John Sculley in the dot-com era. InPhonic sold wireless devices and services online until it went bankrupt in 2007. In April 2007, the FTC charged InPhonic, alleging that the company used rebates to bait its consumers into making purchases, then "among other things, failed to provide promised documents needed to obtain rebates, to send out rebate checks in the time promised, and to disclose adequately certain material terms and conditions prior to purchase."

94.    On this news, the price of the Company's common stock fell $10.46 per share, or approximately 37.07%, from a closing price of $28.22 per share on November 12, 2024 to a closing price of $17.76 per share on November 13, 2024.

95.    That same day, but after the market closed, on November 13, 2024, Zeta issued a press release that refuted the findings of the Culper Report, per a "preliminary review and evaluation of the report." In particular, the press release stated the following, in relevant part:

Zeta is confident in its data collection practices, policies and processes to ensure compliance with applicable laws. We do not operate so-called "consent farms". Zeta has made significant investments in its data protection, data governance, and privacy oversight and is regularly audited and reviewed by partners and clients. In addition, Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners.

Contrary to the report, the total contribution of Apptness and ArcaMax to Zeta's

business is not material. Together, through the third quarter of 2024, their year-to-date revenue contribution is less than 3% and they make up less than 1% of Zeta's data assets. These contributions have trended down. As further evidence of the inaccuracies of the report, Digital Media Solutions is not a material customer or partner, as demonstrated by its trailing twelve-month revenue being less than $200,000 as of September 30, 2024.

## DAMAGES TO ZETA

96.    As a direct and proximate result of the Individual Defendants' conduct, Zeta will lose and expend many millions of dollars.

97.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

99.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

100.    Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

101.    As a direct and proximate result of the Individual Defendants' conduct, Zeta has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

102.    Plaintiff brings this action derivatively and for the benefit of Zeta to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zeta, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

103.    Zeta is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104.    Plaintiff is, and has been at all relevant times, a shareholder of Zeta. Plaintiff will adequately and fairly represent the interests of Zeta in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Zeta's Board consisted of the following eight individuals: Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, Silberblatt, and Khan (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was filed.

107.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to cause the Company to engage in the Data Collection Misconduct. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

108.    All the Director-Defendants, except Director-Defendant Khan, solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Steinberg and Sculley to the Board, thus allowing them to continue breaching their fiduciary duties to Zeta.

109.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Zeta to issue materially false and misleading statements. Specifically, the Director-Defendants caused Zeta to issue false and misleading statements which were intended to obscure the Data Collection Misconduct. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

110.    Additional reasons that demand on Defendant Steinberg is futile to follow. Defendant Steinberg has served as the CEO and as a Company director since founding the Company in 2007. He is also the Company's controlling shareholder, holding 61.2% of the total voting power of the Company. The Company provides Defendant Steinberg with his principal occupation, for which he receives handsome compensation. He caused the Company to engage in the Data Collection Misconduct. Furthermore, he signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendant Sculley to the Board, which

allowed them to continue to breach their fiduciary duties to the Company. As the trusted CEO and controlling shareholder, Defendant Steinberg conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action.  He has a long standing personal and business relationship with controlling shareholder Defendant Sculley which dates to 2007—when the pair founded the Company together—that further prevents him from independently assessing a demand against Defendant Sculley. For these reasons, too, Defendant Steinberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Sculley is futile to follow. Defendant Sculley is a co-founder of the Company, is a Company director, is also the Vice Chairman of Zeta and currently serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Sculley received and continues to receive handsome compensation for his role as a Company director. He caused the Company to engage in the Data Collection Misconduct. In addition, Defendant Sculley signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of himself and Defendant Steinberg to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his

duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He has a long standing personal and business relationship with controlling shareholder Defendant Steinberg which dates to 2007—when the pair founded the Company together—that further prevents him from independently assessing a demand against Defendant Steinberg. For these reasons, too, Defendant Sculley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Khan is futile follow. Defendant Khan has served as a Company director since June 18, 2024. He also serves as a member of the Audit Committee. Defendant Khan has received and continues to receive handsome compensation for his role as Company director. He caused the Company to engage in the Data Collection Misconduct. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Khan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Royan is futile follow. Defendant Royan has served as a Company director since 2017. He also serves as a member of the Audit Committee. Defendant Royan has received and continues to receive handsome compensation for his role as a Company director. He caused the Company to engage in the Data Collection Misconduct. In addition, Defendant Royan signed the false and misleading 2023 10-K and solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants

Steinberg and Sculley to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Royan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114.     Additional reasons that demand on Defendant Elzie is futile follow. Defendant Elzie has served as a Company director since 2021. She also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Elzie has received and continues to receive handsome compensation for her role as a Company director. She caused the Company to engage in the Data Collection Misconduct. In addition, Defendant Elzie solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Steinberg and Sculley to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Elzie breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

115.     Additional reasons that demand on Defendant Landman is futile follow. Defendant Landman has served as a Company director since 2008. He also serves as a member of the Audit

Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee. Defendant Landman has received and continues to receive handsome compensation for his role as a Company director. He caused the Company to engage in the Data Collection Misconduct. In addition, Defendant Landman solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Steinberg and Sculley to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He has a long standing personal and business relationship with controlling shareholder Defendant Steinberg and Defendant Sculley which dates to 2008 at least—when Defendant Landman joined the Board—that further prevents him from independently assessing a demand against Defendants Steinberg and Sculley. For these reasons, too, Defendant Landman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.    Additional reasons that demand on Defendant Niehaus is futile follow. Defendant Niehaus has served as a Company director since 2012. He also serves as the Chair of the Audit Committee and the Chair of the Compensation Committee. Defendant Niehaus has received and continues to receive handsome compensation for his role as a Company director. He caused the Company to engage in the Data Collection Misconduct. In addition, Defendant Niehaus solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Steinberg and Sculley to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, he conducted little, if any, oversight of the

Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He has a long standing personal and business relationship with controlling shareholder Defendant Steinberg, Defendant Sculley, and Defendant Landman which dates to 2012 at least—when Defendant Niehaus joined the Board—that further prevents him from independently assessing a demand against Defendants Steinberg and Sculley. For these reasons, too, Defendant Niehaus breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Silberblatt is futile follow. Defendant Silberblatt has served as a Company director since 2022. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Silberblatt has received and continues to receive handsome compensation for her role as a Company director. She caused the Company to engage in the Data Collection Misconduct. In addition, Defendant Silberblatt solicited the false and misleading 2024 Proxy Statement, which led to the reelection of Defendants Steinberg and Sculley to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Silberblatt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

118.    Additional reasons that demand on the Board is futile follow.

119.     Defendants Niehaus, Royan, and Landman (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Data Collection Misconduct and in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

120.     In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

121.    Zeta has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Zeta any part of the damages Zeta suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

122.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

123.    The acts complained of herein constitute violations of fiduciary duties owed by Zeta's officers and directors, and these acts are incapable of ratification.

124.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zeta. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Zeta, there would be no

directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

125.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Zeta to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

126.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt for Violations of Section 14(a) of the Exchange Act**

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

129.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

130.    Under the direction and watch of Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

131.    The 2024 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Data Collection Misconduct; (2) as such, the Data Collection Misconduct almost completely spurred the Company's growth; (3) as a result of this, the Company's financial results were artificially inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

132.    In exercise of reasonable care, Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not

limited to the re-election of Defendants Steinberg and Sculley.

133.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Steinberg and Sculley to the Board, which allowed them to continue to breach their fiduciary duties to the Company.

134.    The Company was damaged as a result of Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt's material misrepresentations and omissions in the 2024 Proxy Statement.

135.    Plaintiff, on behalf of Zeta, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

136.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zeta's business and affairs.

138.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

139.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zeta.

140.    In breach of their fiduciary duties owed to Zeta, the Individual Defendants willfully or recklessly made and/or caused the Company to engage in the Data Collection Misconduct.

141.    In breach of their fiduciary duties owed to Zeta, the Individual Defendants

willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Data Collection Misconduct; (2) as such, the Data Collection Misconduct almost completely spurred the Company's growth; (3) as a result of this, the Company's financial results were artificially inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

142.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

143.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

144.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

145.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zeta has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of Zeta, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zeta.

150.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Zeta that was tied to the performance or artificially inflated valuation of Zeta, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

151.    Plaintiff, as a shareholder and representative of Zeta, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

152.    Plaintiff, on behalf of Zeta, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zeta, for which they are legally responsible.

155.    As a direct and proximate result of the Individual Defendants' abuse of control, Zeta has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of Zeta, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zeta in a manner consistent with the operations of a publicly held corporation.

159.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zeta has sustained and will continue to sustain significant damages.

160.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

161.    Plaintiff, on behalf of Zeta, has no adequate remedy at law.

### SIXTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

162.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

164.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

165.    Plaintiff, on behalf of Zeta, has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Steinberg and Greiner for Contribution Under Sections 10(b) and 21D of the Exchange Act**

166.    Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

167.    Zeta and Defendants Steinberg and Greiner are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Steinberg's and Greiner's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Zeta.

168.    Defendants Steinberg and Greiner, because of their positions of control and authority as officers and/or directors of Zeta, were able to and did, directly and/or indirectly,

exercise control over the business and corporate affairs of Zeta, including the wrongful acts complained of herein and in the Securities Class Action.

169.    Accordingly, Defendants Steinberg and Greiner are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

170.    As such, Zeta is entitled to receive all appropriate contribution or indemnification from Defendants Steinberg and Greiner.

<u>**PRAYER FOR RELIEF**</u>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Zeta, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zeta;

(c)    Determining and awarding to Zeta the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Zeta and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zeta and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions

as may be necessary to ensure proper corporate governance policies:

       1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       2.  a provision to permit the shareholders of Zeta to nominate at least four candidates for election to the Board;

       3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Zeta restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 11, 2024

                  Respectfully submitted,

                  **THE BROWN LAW FIRM, P.C.**

                  */s/   Timothy Brown*
                  Timothy Brown
                  John Coyle
                  767 Third Avenue, Suite 2501
                  New York, NY 10017

Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        jcoyle@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

 I, Ashraf Mostafa, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

 I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10th day of December, 2024.

Signed by:

Ashraf Mostafa